## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| VSOLVIT, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 22-1913 |
| | ) |
| THE UNITED STATES, | ) Filed: May 25, 2023 |
| | ) |
| Defendant, | ) Re-issued: June 7, 2023[*] |
| | ) |
| and | ) |
| | ) |
| DELOITTE CONSULTING LLP, | ) |
| | ) |
| Defendant- | ) |
| Intervenor. | ) |
| | ) |

## <u>OPINION AND ORDER</u>

Plaintiff VSolvit, LLC, filed this post-award bid protest challenging the United States Department of Agriculture's ("USDA" or "Agency") decision to award a fixed-firm-price Call Order Contract to Defendant-Intervenor Deloitte Consulting LLP under a blanket purchase agreement ("BPA") for Agile Salesforce Portal Development and Support Services.  VSolvit contends that the USDA's award was arbitrary and irrational because (a) the USDA failed to consider VSolvit's subcontractors when evaluating Experience and Past Performance; (b) the USDA improperly assigned VSolvit weaknesses under the Technical evaluation that are contradicted by VSolvit's proposal; and (c) the USDA improperly conducted a price realism

---

[*] The Court issued this opinion under seal on May 25, 2023, and directed the parties to file any proposed redactions by June 1, 2023.  To date, the parties did not propose any redactions.  Therefore, the Court reissues the opinion publicly in full.

analysis, which was prohibited under the Request for Quotation ("RFQ" or "Solicitation").[1] VSolvit requests that the Court set aside the USDA's decision, enjoin performance of the award based on the current evaluation, and require the USDA to reevaluate proposals and make a reasonable award decision.

Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record.  For the reasons discussed below, the Court **DENIES** VSolvit's Motion for Judgment and **GRANTS** the Government's and Deloitte's Cross-Motions.

## I. BACKGROUND

### A.    The Solicitation

The USDA, through its Rural Utilities Service, offers programs that provide financial assistance via guaranteed loans, direct loans, and grant assistance to help support businesses and infrastructure in rural areas.  Admin R. 197, ECF No. 33-1 (hereinafter "AR").[2]  On July 20, 2022, the Agency issued a RFQ pursuant to subpart 8.4 of the Federal Acquisition Regulations ("FAR") to the four companies holding the Agency's Salesforce Portal Development and Support Services BPA.  AR 188, 246, 1356.  Through this procurement, the USDA sought to acquire information technology services to enhance its existing legacy systems to provide a common loan intake, notification, and award process to scale across program areas.  AR 197.  The awarded contract would be for a 12-month base period with three, one-year options.  AR 200.  Initial proposals were due on August 15, 2022.  AR 188.

---

[1] VSolvit also argued that the Agency was required to consider subcontractor experience and past performance on the same level as the prime contractor pursuant to Small Business Administration regulation, 13 C.F.R. § 125.2(g).   VSolvit has since withdrawn its protest arguments based on that regulation.  Pl.'s Withdrawal of Objection at 1, ECF No. 36.

[2] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.

Per the RFQ, the Agency would award the contract based on a best value basis, considering three evaluation factors: (1) Technical; (2) Past Performance; and (3) Price.  AR 248–52.  All the factors would be considered equal.  AR 247.  The Technical factor consisted of the following subfactors: Experience, Technical Approach, Qualifications, and Quality Control.  AR 249–51.  Under the Experience subfactor, offerors were to provide up to five relevant and recent past contracts, which the Agency would evaluate "to determine how closely [the offeror's provided experience] matches the [Performance Work Statement ("PWS")] requirements in scope and size."  AR 249.  "Recent" was defined as performed "within the last 3 years."  AR 249.  The Experience subfactor further required that for each of the contracts listed, the offeror was to provide a brief description and identify the period of performance, contract value, "the amount *your company* has invoiced to date," and a client contact to verify the experience listed.  AR 249 (emphasis added).  The remaining subfactors—Technical Approach, Qualifications, and Quality Control—also included language (*e.g.*, "Offeror's," "your company," or "your quote") indicating that the requested description and details provided should be that of the offeror.  AR 250.

Under the Past Performance factor, the RFQ advised offerors that the Agency would base its evaluation on the same contracts identified for the Experience subfactor.  AR 251.  It specifically instructed that no additional information should be submitted because the USDA "will call and/or email [the] references listed in the Experience technical section . . . to inquire regarding performance on those contracts."  AR 251.  If the references failed to respond, the evaluation rating would result in an unknown confidence level rating.  AR 251.  The RFQ stated that the Agency would also evaluate past performance based on information in the Contractor Performance Assessment Reporting System ("CPARS").  AR 251.  As relevant to VSolvit's key protest ground, the past performance instructions also stated the following: "Relevant and recent past performance

of the *offeror's team*; Relevant performance means projects of similar scope and in similar or greater magnitude as described in the PWS.  Recent means within the last five years."  AR 251 (emphasis added).

Under the Price factor, the RFQ indicated that the Agency would perform a price analysis to ensure the offeror's price was fair and reasonable by performing one or more of the following: comparison of proposed prices received in response to the RFQ, comparison of proposed prices with the Independent Government Cost Estimate ("IGCE"), comparison of proposed prices with available historical information, and/or comparison with market survey results.  AR 251–52.  The Solicitation explained that price would be "evaluated to determine if it reflects the [Contract Line Item Numbers ("CLIN")] structure *and if an adequate deliverable pricing schedule is provided*."  AR 252 (emphasis in original).  With respect to the latter determination, the evaluation would focus on whether the deliverable pricing schedule "*is reasonably related to the PWS deliverables and not front-loaded . . . .*"  AR 252 (emphasis in original).

The RFQ included a Rating System Chart, ranging from supreme confidence to no confidence, that the Agency would use to assess its level of confidence for each evaluation factor:

| | |
|---|---|
| **Supreme Confidence** | The Government has ***supreme confidence*** that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with ***no*** Government intervention. |
| **High Confidence** | The Government has ***high confidence*** that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with ***very little*** Government intervention. |
| **Satisfactory Confidence** | The Government has ***satisfactory confidence*** that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with ***some*** Government intervention. |
| **Low Confidence** | The Government has ***low confidence*** that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract ***even with*** Government intervention. |
| **No Confidence** | The Government has ***no confidence*** that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract ***even with*** Government intervention. |
| **Unknown Confidence** | This category relates only to the Past Performance factor. If no recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonable assigned, the Offeror will be rated as Unknown Confidence. |

AR 253.  With respect to only the Past Performance factor, an offeror with no recent or relevant performance record could receive a rating of "Unknown Confidence."  AR 253.  To be eligible to receive an award, an offeror's quote had to be "deemed to provide at least a satisfactory confidence level or above" for each factor.  AR 248.  The selection criteria also specified that the USDA would award the contract to the offeror "whose Quote, conforming to the [S]olicitation, is fair and reasonable, and has been determined to be most advantageous to the Government . . . ."  AR 248.  The RFQ reserved the Agency's "right to accept other than the lowest priced offer."  AR 248.

On August 4, 2022, the Agency issued Amendment 0001, consisting of its responses to vendor questions, which was incorporated into the RFQ.  AR 659–62, 1358, 1940.  Notably, in response to Question 6, requesting clarity as to the difference between the definitions of "recent" as described in the Experience subfactor versus in the Past Performance factor, the Agency responded as follows:

- Pg 62 – Recent is defined for Experience (What your company did).  Here recent is 3 years as IT changes rapidly and more than 3 years ago may not reflect current industry needs . . . .
- Pg 64 – Recent is defined for past performance.  (How your company performed doing what it did).  Here recent is 5 years as conduct of a company is not relevant to what it did in terms of the job, but how it did (performed on that job).  Conduct is not tied to industry changes . . . .

AR. 661.  On August 24 and 25, 2022, the Agency issued Amendments 0002 and 0003, respectively, to provide clarity on pricing.  AR 663–70, 1358.

### B.    The Evaluation and Award

On the deadline of August 15, 2022, VSolvit and Deloitte, two of the four eligible BPA holders, submitted proposals.  AR 188, 671, 750, 1356.  The USDA received no other bids.  AR 1357.  On August 25, 2022, VSolvit and Deloitte submitted revised price proposals in response to Amendments 0002 and 0003.  AR 1228, 1256.

Between August 15 and 29, 2022, VSolvit and the Agency corresponded regarding the evaluation of the Experience subfactor. AR 842–92. The Contracting Officer ("CO"), Christy L. Glass, emailed VSolvit to clarify whether VSolvit was the prime or subcontractor on the specific work experiences submitted. AR 844–45, 876–77, 886–87, 892–93. VSolvit clarified that its proposed subcontractors exclusively performed the work in four of the five prior contracts identified; and thus, only one experience in VSolvit's proposal represented its own work. AR 752–56, 844, 876, 886, 892. The CO responded that work performed by a proposed subcontractor on a prior contract "cannot stand in the place of *Experience* for the Offeror" and that because "the BPA was solely awarded to VSolvit unfortunately the **only** *Experience* listings we can **fully** evaluate . . . will be the tasks/work that VSolvit itself did and not the intended subcontractors (ASRC, DT Pro & MK Partners)." AR 843–44 (emphases in original). In response, VSolvit requested clarification regarding the Technical factor, arguing that (a) the Solicitation did not prohibit the inclusion of subcontractor experience; (b) the Solicitation allowed for the consideration of recent and relevant past performance of the "offeror's team," which would include subcontractors; and (c) FAR 15.305(a)(2)(iii) requires the consideration of subcontractor's past performance. AR 849–50. The CO replied, explaining that (a) the Solicitation sought the offeror's experience, not that of its subcontractors; (b) the term "offeror's team" meant "a unit of employees that work directly for the Offeror, not the Offeror's subcontractors" and that if VSolvit required clarification then questions should have been addressed before the closing of the RFQ question period; and (c) the acquisition was being conducted under FAR subpart 8.4, not FAR part 15, such that the Agency was not required to consider subcontractor past performance. AR 842.

On August 22, 2022, VSolvit emailed the USDA senior procurement executive, Tiffany Taylor, raising concerns with the CO's interpretation of the Solicitation and noting that the

Agency's "methodology of considering 'prime experience only' would likely result in an evaluation of 'unknown confidence' on prior experience . . . for VSolvit." AR 856; *see* AR 854–56.  On August 29, 2022, Ms. Taylor responded, agreeing with the CO's determination that the RFQ did not require the Agency to consider a subcontractor's experience.  AR 852–83.  That same day VSolvit replied, thanking Ms. Taylor for the response, indicating that while it was disappointing VSolvit "look[ed] forward to participating across other opportunities[,]" and recommending that the Agency adopt a small business-friendly policy of considering subcontractor experience as opposed to only prime contractor experience.  AR 853.  VSolvit did not request to revise or resubmit the technical portion of its quote in light of the Agency's interpretation.

On September 1, 2022, the CO issued the award decision and sent VSolvit a notice of non-selection.  AR 1375, 1894.  The Agency's final evaluation of quotations was as follows:

| Bidder | Overall | Factor 1: Technical | Factor 2: Past Performance | Factor 3: Price |
|---|---|---|---|---|
| **Deloitte** | High Confidence | High Confidence | High Confidence | $9,807,406.42 |
| **VSolvit** | Low Confidence | Low Confidence | Satisfactory Confidence | $6,883,422.30 |

AR 1364.

After highlighting several items that decreased confidence in VSolvit's ability to manage the type of project contemplated by the RFQ, the Technical Evaluation Team ("TET") determined that because VSolvit's quote did not meet the threshold of having at least a satisfactory confidence rating in the Technical factor, it "[did] not meet the minimum threshold of being a vender qualified to perform this acquisition work."  AR 1291; *see* AR 1289–91.  The TET concluded that Deloitte's quote, on the other hand, offered a high confidence level in both Technical – Factor 1, Past Performance – Factor 2, and overall.  AR 1291.  As such, it deemed Deloitte to be likely "the most

successful at completing the PWS requirements." AR 1291. The CO agreed with the TET's assessment, finding that VSolvit's "technical quote did not meet or exceed the Satisfactory Confidence level required as per the evaluation criteria," was lacking details in several areas or nonresponsive to the Solicitation in several key points, and "did not demonstrate a fair pricing as key elements were not priced." AR 1374. The CO accepted the TET's assessment that VSolvit mostly relied on subcontractors' experience in its quote and thus was deficient in several PWS requirements. AR 1360. As well, the CO's analysis adopted the following four weaknesses, unrelated to subcontractors, that VSolvit challenges:

- "Section 1.2.1 demonstrates understanding, but not an approach[.]" AR 1362.

- "GridBuddy has already been replaced. Remaining work is for the Operations Team[.]" AR 1362.

- "One risk is to 'Bring Vlocity current prior to beginning analysis[]' [] but this is an [Operations & Maintenance ("O&M")] responsibility for which their subcontractor is already under contract to complete." AR 1362.

- "VSolvit's quoted Quality Control is generic and doesn't address specific requirements identified under each of the tasks in the PWS . . . . Quality Control is only really talked about in relation to completing major milestones or modules, not talked about on the level of user stories, epics, etc. or quality control at a sprint or iteration level. This is concerning because quality could become a bottleneck at milestones instead of a regular part of the process . . . ." AR 1363.

The CO concluded that an award to VSolvit would place the USDA at risk and would likely result in unsuccessful performance. AR 1374. In contrast, she found that Deloitte's quote offered high confidence in each factor and "was highly acceptable/responsive to the [S]olicitation in all

key points." AR 1374.  Accordingly, the CO determined that Deloitte's quote represented the best value to the Government.  AR 1375.

### C.  Procedural Background

#### 1.  Protest at the GAO

On September 12, 2022, VSolvit filed a protest with the Government Accountability Office ("GAO").  AR 1933.  It claimed, in relevant part, that the Agency erred by failing to consider VSolvit's subcontractors' experience.  AR 1943.  The GAO dismissed this aspect of the protest as untimely.  It held that VSolvit's August 22 email to Ms. Taylor met the standard of an agency-level protest; and thus, VSolvit was required to file a protest at the GAO within 10 days of Ms. Taylor's August 29 reply declining to modify or interpret the Solicitation to require evaluation of subcontractor experience.  AR 3749–50.

#### 2.  The Present Protest

On December 28, 2022, VSolvit filed its Complaint in this Court.  *See* Pl.'s Compl., ECF No. 1.  On January 31, 2023, VSolvit filed a Motion for Judgment on the Administrative Record. *See* Pl.'s Mot. for J. on Admin. R., ECF No. 27.  On February 21, 2023, the Government and Deloitte filed Cross-Motions for Judgment on the Administrative Record.  *See* Def.'s Cross-Mot. for J. on Admin. R., ECF No. 32; Def.-Intervenor's Cross-Mot. for J. on Admin. R., ECF No. 30. The Government later filed a corrected Cross-Motion for Judgment on the Administrative Record. *See* Def.'s Corrected Cross-Mot. for J. on Admin. R., ECF No. 40.  The motions are now fully briefed.  *See* Pl.'s Reply, ECF No. 35; Def.'s Reply, ECF No. 42; Def.-Intervenor's Reply, ECF No. 41.  The Court held oral argument on April 6, 2023.

## II.  LEGAL STANDARDS

### A.      Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.      Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside

10

if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error."  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations.").  The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ."  *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities."  *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive."  *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a protest, the Court applies de novo review to any questions of law.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The interpretation of a solicitation or of

procurement regulations present such questions.  *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986).  Regardless of whether the decision on review is of the contracting officer or of the GAO, the Court of Federal Claims does not afford deference on questions of law. *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021).

## C.      Standing in a Bid Protest

To demonstrate standing in a bid protest, the plaintiff is required to establish that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To show a "direct economic interest," the plaintiff must show that it was prejudiced by the Government's alleged errors by proving it had a "substantial chance" of receiving the contract. *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). Stated another way, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

The Federal Circuit recently held that § 1491(b)(1)'s interested party requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction. *CACI, Inc.-Federal v. United States*, No. 22-1488, 2023 WL 3327090, at *4 (Fed. Cir. May 10, 2023).[3]  According to *CACI*, the Court may thus choose—but is not required—to make an initial, "preliminary determination ('substantial chance') with respect to the plaintiff's chances of securing the contract" before addressing the merits.  *Id.* at *5.  As the Circuit further observed, the

---

[3] The Federal Circuit has not yet issued the mandate in *CACI*.  The Court nonetheless acknowledges the change in precedent on this issue.

statutory standing issue and the merits issue may be overlapping, especially where the plaintiff's protest challenges the contracting officer's evaluation of its own bid. *Id.* (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (noting that propriety of ratings assigned to the protestor's proposal were determinative of both standing and the merits)).

### III.  DISCUSSION

**A.      VSolvit Has Standing to Bring This Bid Protest.**

The Government and Deloitte briefly argue that VSolvit does not have standing to challenge the interpretation of the Solicitation because it does not have a "substantial chance" of receiving the contract.  They contend that if the Court grants VSolvit's requested relief—*i.e.*, amendment of the solicitation and the opportunity to submit revised proposals—VSolvit admittedly lacks the requisite prior experience without consideration of subcontractor experience. *See* ECF No. 40 at 29–30; ECF No. 30 at 34–36.

When considering prejudice as part of a threshold standing inquiry in a bid protest, even in the context of dispositive motions, the Court accepts the protestor's well-pleaded allegations of error in the procurement process to be true.  *See, e.g.*, *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (finding the protestor had standing assuming it succeeded on all its protest grounds); *Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221, 227–28 (Fed. Cir. 2019).  Applying that standard, courts appear to evaluate the allegations of error as a whole when determining whether the protestor has satisfied the standing requirement.  *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 396 (2005) (analyzing standing based on the protestor's "various challenges" to the procuring agency's evaluation and ratings); *see Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir.

2021) (standing inquiry looks at "the combined impact of all agency decisions *alleged* to be unlawful" (emphasis in original)).

The Government's and Deloitte's arguments conflate the prejudice analysis relevant to a standing inquiry with the prejudice element relevant to the merits of the protest.  *See Am. Relocation Connections*, 789 F. App'x at 226 ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions. . . . [If] a party has standing, we [evaluate] the merits . . . and . . . whether it . . . was prejudiced[.]").  Indeed, this case presents a scenario where the standing issue and the merits issue are overlapping.  *See CACI*, 2023 WL 3327090, at *5.  As relevant to the preliminary standing inquiry, the Court finds that VSolvit has shown it would have had a substantial chance of receiving the contract but for all the alleged agency errors. Taking as true that the RFQ unambiguously required the USDA to evaluate VSolvit's proposal by considering subcontractor experience, then the appropriate relief is to set aside the award and require a reevaluation pursuant to the Solicitation's terms.  ECF No. 27 at 22; *see Info. Tech.*, 316 F.3d at 1319.  In that case, the CO could have rated VSolvit as at least "Satisfactory Confidence" under Technical – Factor 1 because crediting its subcontractors' experience would have significantly reduced the number of assigned weaknesses to VSolvit.  *See* AR 752–56, 1361–63.  With only one other offeror in the zone of consideration, which had a substantially higher price quote, VSolvit would have had a "substantial chance" of receiving the contract, especially if the Court also accepts as true that the USDA improperly performed a price realism analysis.  *Myers Investigative & Sec.*

*Servs.*, 275 F.3d at 1370; *see* AR 2665, 2677.  Accordingly, VSolvit has sufficiently demonstrated that it has standing to pursue this bid protest.[4]

**B.       The RFQ Did Not Require the USDA to Consider Subcontractor Experience in Evaluating the Quotes.**

VSolvit argues that the USDA's evaluation of its proposal under the Experience subfactor and Past Performance factor was contrary to the express, unambiguous terms of the RFQ, and that a proper evaluation of VSolvit's experience (to include its subcontractor's experience) would have resulted in higher ratings for Factors 1 and 2.  ECF No. 27 at 21; ECF No. 35 at 9–10.  VSolvit's protest ground rests almost entirely on its interpretation of the term "offeror's team" referred to *once* in the RFQ's Past Performance evaluation criteria—a hefty burden for any single term to carry.  AR 251; ECF No. 27 at 22; ECF No. 35 at 8.

Principally, VSolvit argues that the RFQ's reference to "offeror's team" in Past Performance must "encompass[] more than the offeror itself because the RFQ would have just said offeror if that were indeed the case."  ECF No. 27 at 22.  It emphasizes that "team" is a term of art in government procurements and is commonly understood under FAR 9.601 to include "contractor team arrangements" composed of prime contractors and subcontractors.  *Id.*; 48 C.F.R. § 9.601 (defining an arrangement in which "(1) Two or more companies form a partnership or joint venture to act as a potential prime contractor; or (2) A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program.").  VSolvit argues that the only reasonable interpretation of "offeror's team" would thus include an offeror and its proposed subcontractors.  ECF No. 35 at 8; Oral Arg. Tr. at 12:13–19, ECF No. 46.  Working backwards from the Past Performance factor, VSolvit argues

_____

[4] The Court's conclusion would be the same regardless of whether the issue is analyzed as a jurisdictional or statutory standing question.

that the Experience subfactor likewise contemplated evaluation of prior contracts performed by both VSolvit and its proposed subcontractors, even though the Experience evaluation criteria did not refer to subcontractors or "team" at all.  In the alternative, to the extent an ambiguity existed in the RFQ, VSolvit contends it was latent and should be construed against the USDA.  ECF No. 27 at 24–25; ECF No. 35 at 11–12.

The Government and Deloitte disagree, arguing that neither the FAR nor the RFQ required the USDA to consider an offeror's subcontractors when evaluating Experience or Past Performance.  ECF No. 40 at 28; ECF No. 30 at 12; ECF No. 41 at 6; ECF No. 42 at 6–7.  Both parties highlight that there are no provisions in the RFQ that referred to subcontractors, let alone required the evaluation of subcontractors.  ECF No. 42 at 6; *see* ECF No. 30 at 13.  Moreover, the Government points out that the Solicitation used the word "team" in various ways, undermining VSolvit's contention that "team" has only one reasonable interpretation.  ECF No. 42 at 6; *see, e.g.*, AR 209 ("scrum teams"), AR 218 ("Quality Management Team"), AR 222 ("contractor team"), AR 533 (Team in the Agile Sense—*i.e.*, "a small group of people assigned to the same project or effort").  Deloitte asserts that the broader phrase at issue—"Relevant and recent Past Performance of the offeror's team"—in the section describing the Past Performance factor must be considered in the context of the Solicitation as a whole, and necessarily must be read in light of the Experience subfactor, which limited the past performance evaluation to the offeror's prior contracts.  AR 251; ECF No. 30 at 13–14.  Deloitte argues that this interpretation is reinforced by Question and Answer 6 ("Q&A 6"), which  clearly explained that the evaluation of the Experience subfactor and Past Performance factor would consider what "your company did"—*i.e.*, the offeror, not its subcontractors—and how well "your company performed."  AR 661; ECF No. 30 at 14.

In the alternative, the Government and Deloitte argue that, at best, VSolvit has identified a patent ambiguity apparent on the face of the RFQ, which VSolvit should have raised prior to the close of bidding or award.  ECF No. 30 at 15, 19–22; ECF No. 40 at 23; ECF No. 42 at 5–7; *see Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *see also COMINT Sys.*, 700 F.3d at 1382 (extending *Blue & Gold* to all pre-award situations).

1. <u>VSolvit Has Not Shown That the Term "Offeror's Team" Viewed in the Context of the Whole Solicitation Unambiguously Included Proposed Subcontractors.</u>

VSolvit's primary claim involves an interpretation of RFQ terms, and as such presents a question of law.  *Banknote Corp. of Am.*, 365 F.3d at 1353.  The principles governing contract interpretation apply with equal force when the Court is tasked with interpreting a solicitation.  *Id.* at 1353 n.4 (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed Cir. 1996)).  Thus, the Court must begin with the text of the RFQ.  *Id.* at 1353; *see Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  If the RFQ's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning."  *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Ala. Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).  A mere "disagreement as to the meaning of a contract term does not of itself render the term ambiguous."  *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993).  A court should find a term ambiguous only "[i]f more than one meaning is reasonably consistent with the contract language."  *Grumman Data Sys.*, 88 F.3d at 997; *see Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation." (quoting *Banknote Corp. of Am.*, 365 F.3d at 1353)).

In determining the meaning of its terms, the RFQ must be construed as a whole and "in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr.*, 97 F.3d at 1435 (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)). If the Court finds that "specific and general terms in [the RFQ] are in conflict, those which relate to a particular matter control over the more general language." *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 792 (2008) (quoting *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed. Cir. 1992)). Ultimately, the Court is guided by the principle that an "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs.*, 370 F.3d at 1159.

When viewed in total isolation, VSolvit's understanding of the word "team" is arguably a reasonable one. A "team" is characterized not necessarily by the particular status of its individual members (*e.g.*, who directly employs them) but rather by their collaborative efforts to achieve a common goal. Nothing in the RFQ prohibited offerors from using subcontractors to perform the tasks set forth in the PWS. Thus the term "offeror's team," devoid of any further context, could rationally be read to include subcontractors because that is consistent with the plain and ordinary (and rather broad) meaning of the word "team." AR 251. As VSolvit highlights, even FAR 9.601(2)'s definition of a "contractor team arrangement" specifically contemplates prime contractors teaming up with subcontractors to perform government contracts.

But consistent with the CO's explanation, a "team" can also arguably consist of the offeror and its direct employees. *See* AR 842. Two reasonable interpretations typically suggest that a term is ambiguous. *See Per Aaasleff*, 829 F.3d at 1309. However, after careful consideration, the Court finds that VSolvit's interpretation of "team" ignores the context of the RFQ as a whole and does not make sense of all its provisions. *See McAbee Constr.*, 97 F.3d at 1435. In short, the term

"offeror's team" cannot be read in isolation.  *NVT Techs.*, 370 F.3d at 1159.  Viewing the term in

its proper context, only the Government's and Deloitte's interpretation of "offeror's team" as

referring to the offeror (and those employees working directly for the offeror) is consistent with

the framework of the evaluation as a whole, the requirements of the Experience subfactor, and the

description of the Experience subfactor and Past Performance factor.

First, evaluating the structure and organization of the Past Performance – Factor 2 section

at issue, the relevant term "offeror's team" was mentioned only once within an incomplete phrase

("Relevant and recent Past Performance of the offeror's team;") that introduced the definitions of

"relevant" and "recent" performance under the Past Performance evaluation criteria.  AR 251.  For

clarity, Past Performance – Factor 2 is excerpted in full below.

> **2. Past Performance - Factor 2**
> **Do not submit additional information for this factor.**
> The Government will call and/or email your references listed in the Experience technical
> section for '*Technical - Factor 1: Sub-Factor 2 Experience*' to inquire regarding
> performance on those contracts.
> If the Offeror's references do not respond, the evaluation rating will result in an unknown
> confidence level rating, which is neither favorable nor unfavorable under this section.
>
> The Government will also evaluate an Offeror's past performance based upon information in
> CPARS.
>
> Relevant and recent Past Performance of the offeror's team; Relevant performance means
> projects of similar scope and in similar or greater magnitude as described in the PWS.
> Recent means within the last five years.
>
> *Offerors lacking relevant past performance history will not be evaluated favorably or
> unfavorably in past performance.* However, the quote of an offeror with no relevant past
> performance history, while rated "No Rating" in past performance, may not represent the most
> advantageous quote to the Government as opposed to an Offeror who possess favorable relevant
> past performance history.
>
> **NOTE:** The Government may also utilize the information in SAM per the Excluded Parties
> List System and Central Contractor Online Representations and Certifications Application,
> and other publicly accessible databases, and internet searches.

AR 251.  Notably, Q&A 6 directly addressed what is "recent" for the Experience subfactor versus

the Past Performance factor, by explaining that Experience related to "[w]hat *your company* did"

while Past Performance related to "[h]ow *your company* performed doing what it did[.]"  AR 661

(emphases added).  As explained further below, the term "your company" in the Q&A plainly referred to the offeror, not its proposed subcontractors.  Because the Q&A response was incorporated as Amendment 0001 to the Solicitation prior to the close of bidding, it is part of the Solicitation.  *See Per Aarsleff*, 829 F.3d at 1311 ("[A]nswers [to bidder's questions], when circulated to all [bidders] as an attachment to an amendment signed by the contracting officer, constitute an amendment of the solicitation." (quoting *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n.15 (2012))).

VSolvit's attempt to limit the relevance of Q&A 6 to the meaning of "recency," not the pertinent question of whether "an offeror's team" includes its subcontractors, is unpersuasive. ECF No. 35 at 10.  Because the phrase containing "offeror's team" introduced the explanation of what "relevant" and "recent" mean under Past Performance – Factor 2, the terms were directly linked by the language's placement and structure.  *See* AR 251 ("*Relevant* and *recent* Past Performance of the offeror's team; *Relevant* performance means . . . . *Recent* means . . . ." (emphases added)); *see McAbee Constr.*, 97 F.3d at 1435.  The Government's clarification in Q&A 6 thus fully supports the interpretation that "offeror's team" is synonymous with "your company," which both refer to the offeror itself.[5]

Second, contrary to VSolvit's argument, the Experience subfactor helps inform the meaning of "offeror's team" in the Past Performance factor, not the other way around.  Past

---

[5] That the Agency intended to specifically evaluate the offeror's past performance is also demonstrated by the RFQ's rating system, which had a category only relevant to the Past Performance factor.  AR 253.  Specifically, a rating of "Unknown Confidence" would be assigned if "the *offeror's performance* is so sparse that no meaningful confidence assessment rating can be reasonably assigned[.]"  AR 253 (emphasis added).  Consistent with the rating system, the Past Performance evaluation criteria elaborated that if *an offeror* lacked relevant past performance history, it may receive "No Rating."  AR 251.

Performance – Factor 2 expressly stated that the offeror should submit no additional information for the evaluation because the Agency would contact the references listed in the Experience subfactor to inquire regarding performance on those prior contracts.  AR 251.  Other than what was already submitted under the Experience subfactor, the RFQ also explained that the Government would review information in the CPARS to evaluate "an Offeror's past performance."[6] AR 251.  The RFQ thus confirmed that the Past Performance factor was expressly limited by the Experience subfactor.

To be sure, the RFQ's Experience subfactor was not drafted as clearly as it could have been because the evaluation criteria did not specify at the outset (as the other subfactors of the Technical factor did) that the information submitted should be that of the offeror only, considering it directed the submission of "five relevant and recent past contracts" and stated that an "offeror's *provided* experience will be evaluated."  AR 249 (emphasis added).  However, inartful drafting does not automatically render a solicitation ambiguous.  *See CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 333, 674 (2011).  And the subfactor did explicitly state that for each contract submitted, the proposal should include the "amount *your company* has invoiced to date[.]"  AR 249.  This requisite element for each submitted experience necessarily meant that only prior contracts under which the offeror performed work were relevant to the Experience evaluation, since "your company" was consistently and plainly used throughout the RFQ and in the Q&A 6 to refer to *the offeror's company*.  AR 249–50, 661.  The invoice requirement would be rendered illogical if VSolvit could substitute amounts invoiced to its proposed subcontractors, rather than VSolvit as an independent entity.  Alternatively, VSolvit's interpretation would create a direct conflict in the

---

[6] In Q&A 9, the USDA explained that to perform the CPARS review it would "pull all CPAR reports based on *the quoter's* DUNs/UEI."  AR 662 (emphasis added).

RFQ's language because VSolvit could not strictly comply with the invoice requirement if the Experience and Past Performance evaluations included contracts performed exclusively by its subcontractors. Where specific and general terms are in conflict, those that relate to the specific provision—here, the provision defining the information to be—should control. *See Info. Scis. Corp*, 80 Fed. Cl. at 792. Because the Court's task is to interpret the RFQ in a way that makes sense of *all* its parts without rendering any part nonsensical, inexplicable, or superfluous, it must reject VSolvit's strained interpretation. *See McAbee Constr.*, 97 F.3d at 1435.

Finally, the RFQ repeatedly used language referring to the "offeror," "your company," or "your quote," providing contextual support for the conclusion that "offeror's team" also referred to the offeror's company (and those employed with the company) as opposed to its subcontractors. AR 249–51; *see* AR 250 ("*Offeror's* narrative will be evaluated . . . *Your quote* should convey the story about how the work will be successfully completed and . . . how *your company* will mitigate possible unforeseen challenges . . . *Offeror's* capabilities, background, and relevant information . . . *Offeror's* Key Personnel . . . *Offeror's* brief plan . . . ." (emphases added)). By contrast, the RFQ never referred to an offeror's proposed subcontractors, and it employed the term "team" in a variety of different ways. Looking at the Solicitation as a whole, there is simply no basis to conclude that the lone reference to "offeror's team" was reasonably meant to expand the Agency's Experience and/or Past Performance evaluations to subcontractors where the balance of the RFQ was focused solely on the offeror.

VSolvit argues that the Government's and Deloitte's interpretation renders the word "team" in "offeror's team" superfluous since it could have easily been omitted. ECF No. 35 at 9. The Court disagrees. While the term "team" could aptly describe several possible groupings of individuals or entities, one such group is the employees that work directly for the offeror, as is the

case here, meaning the term is not per se superfluous since it provides some additional detail.  In the context of describing an evaluation focused on "[h]ow your company performed doing what it did," AR 661, the Court cannot agree that including a reference to the employees of the company who performed the work served no useful purpose.

Based on the foregoing, the Court concludes that under the only reasonable interpretation of "offeror's team" the USDA was not required to evaluate VSolvit's proposed subcontractors pursuant to the Experience or Past Performance evaluation criteria.

2.    VSolvit Has Not Shown, In the Alternative, That the RFQ Was Latently Ambiguous.

Even if VSolvit had demonstrated that there was an ambiguity in the RFQ, however, it would be a patent—not latent—ambiguity that VSolvit was required to raise prior to award.  Just as whether a solicitation provision was ambiguous is a question of law for the Court, so is the question of whether an ambiguity was patent or latent.  *NVT Techs.*, 370 F.3d at 1159 (setting forth a two-part analysis: (1) "whether the solicitation supports only one reading or supports more than one reading and is ambiguous," and (2) "whether the ambiguity was patent").  A patent ambiguity is present where there are facially inconsistent provisions that would "place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."  *Per Aarsleff*, 829 F.3d at 1312 (quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)); *see NVT Techs.*, 370 F.3d at 1162 ("If the ambiguity is patent, it triggers a duty to inquire.  A patent ambiguity is one that is "'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" (quoting *H & M Moving, Inc. v. United States*, 204 Ct. Cl. 696 (1974))).  A latent ambiguity is hidden or concealed, not apparent on the face of the document, could not be discovered by "reasonable and customary care[,] and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek

clarification." *Id.* (quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)).  "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest in the Court of Federal Claims." *Blue & Gold*, 492 F.3d at 1313; *see COMINT Sys.*, 700 F.3d at 1382.

Here, assuming the parties' interpretations of the RFQ are both reasonable such that a true ambiguity exists, it was not hidden or concealed.  If, as VSolvit argues, "offeror's team" in Past Performance – Factor 2 could reasonably be construed to include subcontractors, the only place VSolvit could submit its subcontractors' experience in lieu of its own would be under the Experience subfactor of Technical – Factor 1, since no additional information could be submitted for Factor 2 itself.  ECF No. 35 at 12–13.  One would expect that a quoter who so broadly interpreted the word "team" would, as a matter of reasonable and customary care, read the evaluation criteria of Technical – Factor 1, its subparts, the Rating Systems Chart, as well as the clarification in Amendment 0001 and inquire why the USDA specified on several occasions that information submitted should be that of the offeror or "your company" and why the Experience subfactor did not request information as to the "offeror's team."

VSolvit highlights that the language in the Experience subfactor did not expressly specify that the five experiences submitted must be that of the offeror.  And since it "[did] not direct who must submit, just what must be submitted," VSolvit argues that the Solicitation did not present a glaring conflict that would constitute a patent ambiguity.[7]  ECF No. 35 at 13.  Notably, VSolvit

---

[7] VSolvit further contends that the Agency did evaluate its subcontractors, which it "would not have done had it believed 'team' meant just the offeror."  ECF No. 35 at 13.  This contention is expressly belied by the record.  *See e.g.*, AR 1360 (noting that VSolvit heavily relied on subcontractor experience but that "the reviewers only considered the experience of the offeror").

ignores the specific requirement within the Experience subfactor that the offeror submit the "[a]mount *your company* has invoiced to date" for each contract identified.  AR 251 (emphasis added).  As explained above, if "offeror's team" included subcontractors, and thus subcontractor experience was relevant under the Experience subfactor, the invoice requirement was glaringly and obviously illogical or conflicting.  At the very least, Q&A 6 in Amendment 0001, adopted prior to the close of bidding, certainly raised an affirmative duty to inquire because the Agency clarified that the Experience subfactor *and* Past Performance factor would be evaluated based on the distinct experience of "your company"—*i.e.*, the offeror.  AR 661.  As such, accepting VSolvit's reading of the term "offeror's team," the RFQ would be best described as containing "an omission, inconsistency, or discrepancy" and, thus, a patent ambiguity.  *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).

3.    Even Assuming the RFQ Was Ambiguous, VSolvit Cannot Demonstrate Prejudice.

Accepting *arguendo* that VSolvit has shown the term "offeror's team" is either patently or latently ambiguous, it cannot be afforded the relief it seeks because it cannot show that the ambiguity prejudiced it.[8]  *Alfa Laval*, 175 F.3d at 1367 (explaining that prejudice is established by showing there was a substantial chance the protester would have received the contract award but for the agency's error); *see Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest[,] the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").

Here, if the Court remanded the matter for the Agency to clarify the meaning of "offeror's team," VSolvit would be entitled to submit another proposal including only its own experience as

---

[8] For this reason, the Court need not address the parties' dispute as to whether VSolvit preserved its argument by submitting an agency-level protest prior to award.  ECF No. 27 at 18; ECF No. 35 at 9–10; *see* ECF No. 30 at 18–19, ECF No. 41 at 14.

opposed to that of its proposed contractors.  ECF No. 46 at 18:8–19:16, 33:6–18, 44:3–19; *see e.g.,*
*ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188, 210 (2018) (granting protest and ordering the
agency to clarify a latently ambiguous term to clearly state the requirement and provide offerors
an opportunity to submit revised quotations).  However, the record establishes that VSolvit does
not have the necessary experience on its own; and therefore, VSolvit is unable to demonstrate
prejudice.  *See Data Gen.*, 78 F.3d at 1562.  In its current proposal, only one of the five submitted
experiences was that of VSolvit.  AR 752–56.  In an email to Ms. Taylor, VSolvit admitted that
the USDA's current evaluation methodology "of considering 'prime experience only' would likely
result in an evaluation of 'unknown confidence' on prior experience for small business offerors
such as VSolvit."  AR 856.  And after Ms. Taylor affirmed that the Agency's evaluation
methodology did not consider subcontractor experience, VSolvit expressed disappointment,
encouraged the Agency to modify its policy to permit subcontractor experience so small businesses
could participate, and noted an intention to participate in other opportunities—implying that
VSolvit recognized it would not be able to revise its proposal with additional experience of its
own.  AR 856.  As the Government highlights, that inference is supported by the fact that, after it
learned that subcontractor experience would not be considered, VSolvit did not seek to amend its
quote.  ECF No. 40 at 29.  Furthermore, in the GAO protest, VSolvit expressly conceded that its
"experience alone [did] not meet all the Solicitation requirements."  AR 1951.

As such, based on the record before it, the Court concludes that without VSolvit's proposed
subcontractors' experience, it cannot improve its low confidence rating under Technical – Factor

1.[9]  Therefore, even if there were an ambiguity in the RFQ, VSolvit cannot demonstrate prejudice because it remains ineligible for, and thus does not have a substantial chance of winning, the award.

**C.**     **VSolvit Fails to Show that the CO Irrationally Assigned Weaknesses to VSolvit Under the Technical Factor.**

Other than weaknesses assigned based on its lack of sufficient experience, VSolvit argues that the CO irrationally assigned four weaknesses to VSolvit under Technical – Factor 1.[10]  The Court concludes that all four weaknesses were rationally assigned.

1.     The CO Rationally Assigned VSolvit a Weakness Because Section 1.2.1 of Their Quote Demonstrated an Understanding, But Not an Approach.

The CO concluded that VSolvit's technical proposal for providing Development, Modernization, and Enhancement ("DME") support services (Section 1.2.1) "demonstrates understanding, but not an approach[.]"  AR 1362.  VSolvit argues that the CO's failure to recognize its approach is arbitrary and capricious, noting that it described how it would update the Agency's existing system and ensure the task was completed, provided specifics of key system updates, and demonstrated its knowledge and experience in carrying out the described processes.  ECF No. 27

---

[9] At oral argument, when asked whether VSolvit would be able to submit more information of its own with regard to experience and past performance, counsel indicated that VSolvit has "experience with this work" and "their own independent ability to perform."  ECF No. 46 at 19:17–20:8.  From this response, it is not clear that VSolvit could identify additional contracts for the Experience subfactor.  And considering VSolvit's representations to the contrary in the administrative record before the Court, counsel's response does not "rise above a 'bare possibility' that a new proposal would improve [VSolvit's] Factor 1 rating, let alone lead to a substantial chance of award."  *Coastal Env't Grp., Inc. v. United States*, No. 22-868C, 2023 WL 1794581, at *10 (Fed. Cl. Jan. 19, 2023).

[10] VSolvit challenged several assigned weaknesses on the basis that the CO did not properly consider its proposed subcontractors' experience, including lack of experience in Salesforce; eNotary; Development of Map, Mapping Tools, and Searchable Map Databases; Secure and Scalable Application Programming Interfaces using Mulesoft; Creating, Modifying, and Hosting ArcGIS Rest Services and APIs; and GIS Integration.  ECF No. 35 at 17–22.  Because the Court finds that the Agency was not required to consider subcontractor experience, no further review of these weaknesses is necessary.

at 30; AR 757.  The Government and Deloitte argue that the CO's assignment of this weakness was rational because a plain reading of Section 1.2.1 of VSolvit's proposal demonstrates its understanding, knowledge, and experience but does not provide a clear approach explaining *how* it will perform the PWS requirements.  ECF No. 40 at 33–34; ECF No. 30 at 37.

Based on a review of VSolvit's quote, the CO's assessment was rational.  Specifically, VSolvit's proposal outlined what the USDA aimed to achieve in the procurement (*e.g.*, update the ReConnect online application, allow Telecom Program's Public Notice Filing and Responses, etc.), demonstrating an understanding of the required tasks, and it repeatedly discussed VSolvit's knowledge and related experience to demonstrate it was well positioned for the work.  But VSolvit failed to provide details about how it would perform the work.  AR 757–59.  As such, it was not irrational for the CO to conclude based on a plain reading of its proposal that VSolvit failed to provide an approach.  Where the CO has provided a clear, rational basis supporting her decision, mere disagreement with the Agency's evaluation is not sufficient to establish that the evaluation was unreasonable or that the process was arbitrary or capricious.  *See Bannum*, 91 Fed. Cl. at 171, 176.

2.     The CO Rationally Assigned VSolvit a Weakness  for its Discussion of GridBuddy.

The CO agreed with the TET's assessment that VSolvit's discussion of GridBuddy decreased confidence in its proposal.  AR 1362.  Specifically, the CO noted that GridBuddy had already been replaced and that the remaining work was for the operations team, not the awardee in this procurement.  AR 1362.  VSolvit argues that it "received a weakness merely for mentioning that it had 'detailed knowledge of the overall GridBuddy implementation and how to address replacing it with Lightening Component approaches and are prepared to remove it [once approved] on the application intake window.'"  ECF No. 35 at 24 (quoting AR 758).  Since VSolvit did not

propose GridBuddy as a solution and since the RFQ did not state the Agency would evaluate its use (or non-use) of GridBuddy, VSolvit claims the CO's evaluation applied an unstated evaluation criteria.  ECF No. 27 at 30–31.  The Government and Deloitte argue VSolvit appeared to not appreciate that GridBuddy had already been replaced, and thus knowledge and planning to replace it was irrelevant to the PWS and demonstrated a lack of understanding of the RFQ requirements. ECF No. 40 at 34; ECF No. 42 at 17; ECF No. 30 at 38–39; ECF No. 41 at 18.

The Court finds that the CO rationally determined that the GridBuddy aspect of VSolvit's technical quote decreased confidence in its proposal because it sought to replace a system that had already been replaced.  Fundamentally, that is not an irrational conclusion.  If, as VSolvit contends, it intended only to demonstrate its knowledge and experience, then it should have clearly communicated that fact, because a plain reading of the relevant segment proposes to "remove" GridBuddy, which had already been replaced.  *See* AR 758; *Wis. Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 35 (2020) ("[I]t is the offeror's responsibility to provide technical evaluators with a well-written proposal. . . . [T]he CO [was] under no obligation to discern what [the offeror] 'intended to communicate[.]'" (quoting *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 385 (2019))).

3.    The CO Rationally Assigned VSolvit a Weakness for its Discussion of Vlocity.

In a similar vein, the CO noted that VSolvit proposed to "bring Vlocity current prior to beginning analysis" of Vlocity applications, since it was "several major upgrades behind in the RD Force environment," even though such update was an O&M responsibility for which one of VSolvit's proposed subcontractors was under contract to perform.  AR 760, 1362.  VSolvit argues that the Solicitation required offerors to provide an analysis of Vlocity applications to determine the potential impact on a successful Review Module implementation, and that the weakness is

misguided and taken out of context because VSolvit proposed to bring Vlocity current only to address a potential risk.  ECF No. 27 at 31; ECF No. 35 at 25; *see* AR 210.  VSolvit also raises a disparate treatment claim, arguing that Deloitte also addressed Vlocity by stating it "will update the environmental questionaries [("EQ")], which currently leverage [V]locity" but that the Agency did not comment on or assign a similar weakness to Deloitte.  AR 681; *see* ECF No. 27 at 32; ECF No. 35 at 25.

In response, the Government and Deloitte argue that the RFQ did not require offerors to update or bring Vlocity current because, as the CO correctly noted, that task was assigned under an incumbent contract as an O&M responsibility.  ECF No. 40 at 34; ECF No. 30 at 41; *see* AR 1362, 1372.  Moreover, they argue that the Agency did not treat VSolvit disparately because the TET assigned a weakness to Deloitte regarding Vlocity, albeit for a different reason (providing inaccurate information), and because Deloitte did not propose to bring Vlocity current but rather indicated that it would update EQs, which is a different task.  ECF No. 40 at 35; ECF No. 30 at 41–42; AR 1214.

Yet again, VSolvit received the weakness because its proposal demonstrated a lack of understanding of the RFQ.  It was not irrational for the CO to have lower confidence in VSolvit for proposing to update an application as part of its technical approach to perform the PWS requirements, where the proposed task was beyond the scope of the PWS and already part of the incumbent contract as an O&M responsibility of VSolvit's own subcontractor.  If VSolvit intended to convey that it would address any potential risks by simply ensuring that Vlocity was up to date, it should have clearly communicated as much, instead of stating that it would "[b]ring Vlocity current prior to beginning analysis."  AR 760; *see Wis. Physicians Serv.*, 151 Fed. Cl. at 35.  As written, the CO rationally concluded that VSolvit misunderstood the RFQ.  Moreover, VSolvit

cannot succeed on a disparate evaluation challenge because Deloitte's and VSolvit's approaches

with respect to Vlocity are not "substantively indistinguishable," since VSolvit proposed bringing

Vlocity current while Deloitte proposed to update EQs.  *See Office Design Grp. v. United States*,

951 F.3d 1366, 1372 (Fed. Cir. 2020) (explaining that to prevail on a claim of disparate evaluation,

"a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that

were 'substantively indistinguishable' or nearly identical from those contained in other

proposals").

    4.    <u>The CO Rationally Assigned VSolvit a Weakness for its Generic Quality Control.</u>

VSolvit next challenges the weakness assigned to its quality control discussion.  Relevant

here, the CO explained:

> VSolvit's quoted Quality Control [("QC")] is generic and doesn't address specific
> requirements identified under each of the tasks in the PWS.  The QC checkpoints
> seem only relevant for waterfall projects ("Analysis phase", "design phase", "build
> phase).  The PWS requested agile development, which is based on recurring
> iterations of Analysis/Design/Build/Test.  Also, Agile uses a Jira backlog, not a
> Requirements Traceability Matrix [("RTM")].  Quality Control is only really talked
> about in relation to completing major milestones or modules, not talked about on
> the level of user stories, epics, etc. or quality control at a sprint or iteration level.
> This is concerning because quality could become a bottleneck at milestones instead
> of a regular part of the process.  Peer reviews appear to be a random inspection
> rather than a key process and does not state what percentage of code is randomly
> inspected.

AR 1363.  VSolvit argues that the Agency's finding was factually incorrect because it provided a

robust response regarding quality control.  For example, VSolvit explained that its "agile quality

practices apply to every team," that each team was applying an agile framework at all times and,

to ensure accountability "at the team, program, and solution level," was "report[ing] weekly and

monthly in our status reports," AR 775; that it would work with Product Owners ("PO") "to

capture, decompose, clarify, and qualify Features, Epics, and User Stories establishing a rich

product backlog" for Program Increment ("PI") planning and execution as well as roadmap

activities, AR 758; and that peer reviews would be random and planned, AR 775. ECF No. 27 at 32–34; ECF No. 35 at 26–27. The Government and Deloitte contend that the Agency's assessment of VSolvit's quality control was reasonable and supported by the record. ECF No. 40 at 35–36; ECF No. 30 at 42. Specifically, they contend VSolvit's approach to quality control was inconsistent with Agile methodology and relied instead on waterfall methodology, which was directly contrary to the Solicitation requirements. ECF No. 40 at 36; ECF No. 42 at 18; ECF No. 30 at 43; ECF No. 41 at 19.

Based on a review of VSolvit's quality control section, and the specific quality control checkpoints outlined in Table 4 ("Quality Control Checkpoints"), the CO rationally found that VSolvit's quality control was generic, its checkpoints seemed relevant to waterfall projects methodology as opposed to the requested agile methodology,[11] its quality control was only discussed in relation to major milestones as opposed to at a sprint or iteration level that could possibly lead to bottlenecks, and that peer reviews did not appear to be a key process. While aspects of VSolvit's quality control plan arguably addressed Agile methodologies, it was not irrational for the Agency's evaluation to conclude that the quality control checkpoints (Table 4) were not based on Agile methodology and appeared instead appropriate for waterfall projects. AR 775–76, 1363. The Solicitation specifically required the offeror to use the latest Scaled Agile Framework principles to plan and execute program-wide value delivery for the Agency, AR 209, and to use Agile methodologies to prepare user stories that align with functional requirements, AR

_____

[11] The Agency included with the Solicitation its System Development Lifecycle ("SDLC") Process Guide, which explained the difference between Agile and waterfall methodologies. AR 526–75. Many activities for Agile and waterfall projects are similar; however, under waterfall methods, "design," "develop," and "test" stages are conducted separately rather than repeatedly within iterative sprints, as under Agile. AR 534, 555; *see* AR 532, 538–39, 554. Also, the Guide explained that RTM is used in waterfall projects while a release backlog is used in Agile methodology. AR 536, 556–57.

218.  The Solicitation also required that "[t]he output from Requirement Analysis shall be stored and maintained with User Story in Jira."  AR 220.

Nevertheless, Table 4, as the weakness accurately captured, only discussed major milestones as opposed to the sprint or iteration level goals expected in Agile methodology.  AR 776, 1363.  While VSolvit generally stated it would use Agile methodology at all levels and at all times, its specific checkpoints were inconsistent with those statements.  Additionally, in Table 4, VSolvit stated that a key output of requirements review is RTM, AR 776, which is indicative of waterfall methodology (not Agile methodology) and was contrary to the express requirement that the output from the requirement analysis be stored and maintained with user story in Jira, AR 220. In any case, absent erroneous findings or reasoning that would indicate that the assigned weakness was the result of irrational decision-making, the Court will not nit-pick the "minutiae of the procurement process."  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (quoting *E.W. Bliss*, 77 F.3d at 449).  Based on the foregoing and given the high degree of discretion afforded to the Agency, the Court declines to second-guess the Agency's technical evaluation, and concludes that the CO rationally assigned a weakness to VSolvit under the quality control subfactor.  *See Redland*, 39 Fed. Cl. at 231 (explaining that under the arbitrary and capricious standard, the court should not substitute its judgment for that of the agency).

\*     \*     \*

In sum, VSolvit has not demonstrated that any challenged weakness was irrationally assigned and that it should have received a higher rating under Technical – Factor 1.  With its low confidence rating intact, VSolvit  remains ineligible for award.

**D.      The USDA Did Not Conduct an Improper Price Realism Analysis.**

Since VSolvit is ineligible for award based on its low confidence rating under the Technical factor, the Court need not address the remaining price realism claim because even if the Agency's price evaluation was improper it would not constitute a prejudicial error.  *See Alfa Laval*, 175 F.3d at 1367.  Nevertheless, for the sake of completeness, the Court will briefly address the challenge.

VSolvit argues that the Agency arbitrarily and irrationally evaluated price by conducting a price realism analysis that was prohibited under the RFQ.  ECF No. 27 at 35; ECF No. 35 at 27.  VSolvit points to the following language in the CO's evaluation to allege that the Agency conducted an improper price realism analysis:

> Comparing the IGCE above to the quoted price, it is noted that Deloitte's quote total is apx 7% lower than the IGCE, which is a reasonable variance.  However, VSolvit's *quoted price is apx 37% lower than the IGCE, which reflects a lack of understanding of the labor[,] effort[,] and time required by the type of work in this acquisition*.
>
> . . . [T]he RFQ did not specifically state that a [p]rice [r]ealism analysis would be conducted; [t]herefore, a [p]rice [r]ealism analysis will not be conducted.
>
> . . . VSolvit's quoted price also could reflect [p]rice [r]easonableness as it is not higher than the IGCE; however, VSolvit's quoted price is missing key elements of areas that should have been priced out separately in the Pricing Delivery Schedule, such as Demos . . . .
>
> VSolvit was missing key elements in its pricing schedule could account for the extremely low price (apx 37% lower than ICGE), which demonstrates that performance of the contract would be at risk if VSolvit was awarded this acquisition effort.  Coupled with Low Confidence rating on its Technical evaluation, *it becomes obvious that VSolvit is underestimating the level of work involved* in the acquisition effort due to its inexperience in acquisitions of this scope and size.

AR 1366 (emphases added); *see* ECF No. 27 at 36.   VSolvit contends the two statements emphasized above prove that the Agency conducted a price realism analysis.  ECF No. 27 at 36–37; ECF No. 35 at 28–29.  The Court disagrees and finds that the Agency evaluated price consistent with the express terms of the RFQ (permitting comparison of quotes to the IGCE) and

appropriately evaluated risk to the Government in its best-value award determination in light of the key elements missing in VSolvit's pricing schedule.

"[A] price realism analysis 'examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals[.]'" *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 356 (2015). "[I]t involves analysis for prices that are too low." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 137 (2022). Generally, "it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria." *Navarro Rsch. & Eng'g, Inc. v. United States*, 151 Fed. Cl. 184, 196 (2020) (quoting *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 561 (2017)). However, a review of risk as part of a best-value tradeoff decision does not necessarily amount to an unlawful cost or price realism analysis. *See Kiewit Infrastructure W. Co. v. United States*, 137 Fed. Cl. 689, 698 (2018) ("The court agrees with the government and FDS that the review of cost risks as part of the best-value tradeoff decision was not an unlawful cost realism analysis or otherwise unlawful.").

Here, the RFQ stated that the USDA would employ techniques to ensure "a fair and reasonable price," *e.g.*, "comparison of proposed prices received in response to RFQ" and "comparison of proposed prices with the IGCE." AR 251–52. The pricing would be evaluated to determine if it reflected the CLIN structure and if an adequate deliverable pricing schedule was provided, and the deliverable pricing schedule would be evaluated to determine if it was reasonably related to the PWS schedule. AR 252. The selection criteria also noted that the Government reserved the right to accept other than the lowest priced offer. AR 248. As VSolvit correctly notes, the RFQ did not state that the Agency would review proposals for price realism, and in fact,

the CO specifically disclaimed conducting a price realism analysis.  ECF No. 27 at 36; *see* AR 1366 ("[T]he RFQ did not specifically state that a [p]rice [r]ealism analysis would be conducted; therefore, a [p]rice [r]ealism analysis will not be conducted.").

The CO's price evaluation did precisely what the RFQ expressly stated; it employed techniques such as a comparison of the proposed prices with the IGCE to evaluate whether VSolvit's price was fair and reasonable.  As such, the comparison of VSolvit's proposed prices to the IGCE as being approximately 37 percent lower than the ICGE was entirely permissible under the terms of the RFQ.  Next, in evaluating whether VSolvit provided an adequate deliverable pricing schedule and whether it was reasonably related to the PWS deliverables, the CO noted that VSolvit's pricing schedule was missing key elements, such as allotments for demos and details regarding the quantities and frequencies for the testing of code, code delivery, and test scripts.  AR 1366; *see* AR 1367 (The "deliverable pricing schedules are missing vital supporting/detailed information").  A review of the deliverables outlined in the RFQ, AR 232–33, 252, compared to Deloitte's deliverable pricing schedule, AR 1245–53, and VSolvit's pricing charts, AR 1267–81, supports the CO's conclusion that key elements such as quantities, frequencies, and other details were missing.  As such, it flows logically (and is not irrational) that the CO found VSolvit's quote demonstrated a lack of understanding as to the labor effort and time involved and that performance would be at risk if VSolvit was awarded the call order.  AR 1366.  Ultimately, the CO concluded that VSolvit's "pricing quote did not demonstrate fair pricing as key elements were not priced." AR 1374.  This did not amount to an unlawful price realism analysis; rather, it was in line with the terms of the Solicitation.  Moreover, since the CO was making a best-value award determination, she was permitted to evaluate performance risk to the Government without such considerations amounting to an unlawful price realism analysis, as VSolvit concedes.  *See* ECF No. 35 at 30.

**E.    No Injunctive Relief Is Warranted Because VSolvit Fails on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Because VSolvit has not succeeded on the merits of its protest, no injunctive relief is warranted in this case.  *See Mitchco Int'l*, 26 F.4th at 1384 n.7; *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## IV. CONCLUSION

For the reasons set forth above, VSolvit's Motion for Judgment on the Administrative Record (ECF No. 27) is **DENIED**, Deloitte's Cross-Motion (ECF No. 30) is **GRANTED**, and the Government's Corrected Cross-Motion (ECF No. 40) is **GRANTED**.  Also, the Government's First Cross-Motion (ECF No. 32) is deemed **MOOT**.  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after June 5, 2023, unless the parties submit **by no later than June 1, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: May 25, 2023                                     */s/ Kathryn C. Davis*_____
                                                        KATHRYN C. DAVIS
                                                        Judge